IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 23, 2008

## STATE OF TENNESSEE v. CHRISTOPHER BRIAN KNIGHT

**Appeal from the Circuit Court for Jefferson County**
**No. 8220    O'Duane Slone, Judge**

---

### No. E2007-01456-CCA-R3-CD - Filed February 9, 2009

---

The Defendant, Christopher Brian Knight, was convicted of one count of theft over $10,000, a Class C felony. The trial court sentenced him as a Range II, multiple offender to ten years in the Department of Correction. In this direct appeal, he argues that (1) the trial court erred in denying his motion for a continuance; (2) the trial court erred in denying his motion for a mistrial; (3) he was deprived of a fair trial before an impartial judge; (4) the State presented evidence insufficient to convict him; (5) he was prejudiced by the trial court's failure to confirm that he had personally decided to waive his right to testify; and (6) the trial court improperly sentenced him to the maximum sentence. We conclude that all of these contentions lack merit. We accordingly affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined. JOSEPH M. TIPTON, P.J., filed a dissenting opinion.

R.B. Baird, III, Rogersville, Tennessee, for the appellant, Christopher Brian Knight.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James Dunn, District Attorney General; and Charles L. Murphy, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

#### Factual Background

The actions giving rise to this case began on July 22, 2004. On that day James Fox, a self-employed subcontractor, was working for the local government on Leadvale Road in Jefferson County. Fox testified that on that day, as he had for the previous five days, he planned to use a backhoe to assist government workers in digging up a damaged underground phone cable near the side of the road. On the morning of July 22, the sixth day of the job, he drove his 1995 International dump truck toward the job site, towing his backhoe on a trailer behind the truck. Because there was

insufficient room near the job site itself to park his truck, he parked about a quarter-mile from the site. He then removed his backhoe from the trailer and drove it up a hill and around a curve in the road to the job site. These events occurred between 9:00 and 9:30 a.m. Fox testified that he could not see his truck from the job site.

At about 11:00 a.m., Fox returned to where he had parked his truck and saw that it was gone. He first called his wife, told her his truck had been stolen, and asked her to call around Newport and tell people to look for it. He then called the police. Fox's wife called their daughter, Lisa Calfee, and informed her of the theft. Calfee testified that she received the call at about 11:00 a.m., as she arrived for her work-shift at the Rocky Top General Store, a gas station and convenience store about six miles from the site of the apparent theft. Calfee was explaining the situation to a co-worker "not five minutes later" when she saw her father's truck pull into the store's parking lot. Thinking that her parents were playing a practical joke on her, and therefore assuming she would find her father in the driver's seat, she walked out of the store to investigate. She approached the truck on its driver's side. When she was about twenty feet from the driver's door, she saw, in the side mirror, the reflection of someone other than her father. She continued to approach. When she was about ten to fifteen feet from the door, the driver stuck his head out the open window and looked at her. After "a second or two," he pulled his head back into the truck and hurriedly drove away as Calfee yelled, "Get out of my daddy's truck!" Calfee did not recognize the driver.

Calfee ran back into the store, on the way asking her co-worker to call the police. Once in the store, she retrieved her car keys. She ran back out of the store, started her car, and drove down the road in pursuit of the truck. About this time, a deputy met Fox at the site of the theft, where Fox testified he began to fill out a report. Apparently as a result of Calfee's co-worker's call to the police, a message came through over the deputy's scanner that Calfee had spotted Fox's truck and was attempting to follow it.

Some time later Calfee, unable to find the truck, called her co-worker, who told her that the police were congregating on nearby Emanuel Road, in Cocke County. She drove there and found that her father's truck had been recovered. Fox also learned this and arrived there. Upon arrival, Fox found his truck with "the switch . . . pulled out of it and the glass broke out of it." He and Calfee drove the truck away. Fox testified that he did not know the Defendant and did not give the Defendant permission to use his truck. He also testified that the truck and trailer were worth about $30,000.

Tracy Ivy, at the time a detective with the Jefferson County Sheriff's Department, was assigned to the case after Fox and Calfee recovered the truck. Detective Ivy did not originally visit the crime scene, although he subsequently did so. In his testimony, Det. Ivy first outlined the spatial relationship between relevant locations surrounding the crime, using a map as an aid. He testified that, in his opinion, it would take about twenty minutes to drive a truck from the location of the theft to the Rocky Top General Store. He also pointed out the site where Fox's truck was recovered, as well as the location of the Defendant's house, which was within about a half-mile of the location of the theft.

Detective Ivy also detailed the actions he took in his investigation. He did not take fingerprints from Fox's truck. He spoke to Calfee one or two days after the theft and listened to her account of the incident. She described the driver of the truck as "slim, 5 feet 8 inches, 135-140 pounds, early 30s, young." She also said he wore a "[t]an or green Gilligan-type hat." Based on this information, Det. Ivy assembled a photo array of six potential suspects. Slightly more than seven months later, Det. Ivy showed Calfee the photo array in her home, with two Cocke County Sheriff's Department employees present as witnesses. Det. Ivy testified that Calfee "had [the photo array] in her hands for probably a minute" before she identified the Defendant. Calfee testified that "[i]t didn't take [her] but just a few seconds . . . [she] looked at it and [she] said, 'That's him.'" Calfee had identified the Defendant. She signed her name under the Defendant's picture and dated it "3-1-05 2:35 PM." At trial, she identified the Defendant, with "one hundred percent" certainty, as the driver of her father's truck.

The Defendant chose not to testify, but he presented three alibi witnesses. The first, James McCoig, testified that he lived across the street from the Defendant's grandfather's house. The Defendant lived on his grandfather's property at the time of the crime. McCoig said he remembered, on July 22, 2004, seeing a man operating a backhoe across the street from him, in front of the Defendant's grandfather's property. He walked across the street and briefly spoke to the Defendant, in the Defendant's grandfather's driveway, about the backhoe. McCoig then returned to his home to cook for his disabled wife and did not see the Defendant thereafter. Because he always cooks for his wife at the same time each day, McCoig remembered that these events occurred five to ten minutes before 11:00 a.m. McCoig did not remember seeing the backhoe across the street on any other day besides July 22, 2004.

Jerry Rosenbaum, the next witness, had known the Defendant for seven or eight years. He testified that at about 9:00 a.m. on July 22, 2004, he arrived at some property the Defendant owned, near the Defendant's grandfather's property, for the purpose of helping the Defendant and a mason install some stone steps down a hill to the nearby river. The Defendant was present at the steps when Rosenbaum arrived. He stayed in order to show Rosenbaum how to mix the mud for the steps, leaving at between 10:00 and 10:30 a.m. The Defendant returned twenty or twenty-five minutes later, just before 11:00 a.m. He stayed another twenty or twenty-five minutes, checking on the progress of the work. Thereafter, the Defendant was "back and forth" all day, but never gone from more than an hour or hour and a half. At the end of the day, the Defendant's grandfather came down to the steps and asked Rosenbaum about the Defendant's activities earlier that day. On cross-examination, Rosenbaum admitted that he had never called the police with this alibi information and that he could not remember what he had done the day before or after July 22, 2004.

Chris Cody, the Defendant's third witness, knew the Defendant "to hear his name," but not personally, on the day of the crime. He had since done some heating and air conditioning work for the Defendant. On July 22, 2004, Cody was employed by Renner Heating and Cooling. That morning he was parked, in his work vehicle, in the Rocky Top General Store parking lot, where he planned to meet a customer. That customer soon arrived. As Cody began to follow the customer's vehicle out of the parking lot, he noticed a woman come out of the store "screaming and making

noises" as she approached a nearby dump truck. When she got within twenty to thirty feet of the truck, it drove away. Cody "figured it was a domestic dispute."

The State then called Jimmy Calloway as a rebuttal witness. Calloway lived down the road from the Defendant, and he had known him since the Defendant was a child. Calloway helped Rosenbaum and the Defendant build the steps down to the river, although he could not specifically recall whether he had helped on July 22, 2004. Calloway therefore did not know whether the Defendant had been present that day. In May 2005, however, the Defendant approached Calloway and asked him to testify that he had worked with the Defendant that entire day. Calloway could not recall any day of work during which the Defendant had been constantly present; he could at best recall the Defendant being present on any given day, during the three to four weeks Calloway helped with the steps, for a couple of hours in the morning or evening. As such, he declined the Defendant's request. The Defendant then told Calloway that "somebody would pay" if he were convicted. Calloway perceived this as a personal threat, although he did not find the Defendant threatening.

The Defendant was tried on January 25, 2007. On that day, and before the trial began, the court received evidence that the Defendant had attempted to tamper with a member of the jury pool named Susan Blanchard. On that basis, the court informed the jury that "[t]here has been an allegation of some jury tampering," and ordered each member of the jury interviewed by agents of the Tennessee Bureau of Investigation (TBI).

The trial court also, out of the jury's presence, conducted a bond revocation hearing. During that hearing, the State called TBI agent Brian Fraley, who testified that Blanchard had called the clerk's office the previous day to report that the Defendant had approached her. The clerk's office had apparently contacted the district attorney's office. In turn, the State contacted the TBI for investigation. Agent Fraley had spoken to Blanchard and obtained from her a written, signed statement. Because Blanchard could not immediately be located, Fraley read her statement aloud without objection from the Defendant. In it, Blanchard indicated she had known the Defendant most of her life. Blanchard also recounted that at about 11:30 a.m. on January 23, 2007, two days before the trial, the Defendant approached her in the parking lot of a Family Dollar store in White Pine, Tennessee:

"As I pulled into the parking lot, I noticed two dark pickup trucks parked in the lot. I parked my car and as I was exiting my vehicle, [the Defendant] exited his truck and approached me. [He] stated, quote, 'Hey, Susan, you're just the woman I've been looking for. You're on the jury aren't you?' End quote. He [sic] replied, yes, I've got to go on Thursday, and [the Defendant] said, quote, 'They've got something on me.' End quote. I continued walking towards the store and [the Defendant] said, quote, 'Can you hang the jury?' End quote. I kept walking and [the Defendant] said that his buddy was over there looking over the jury list. I proceeded towards the store and [the Defendant] said a second time, quote, 'Can you hang the jury?' End quote. And walked back toward his truck."

-4-

Relying on this testimony, the trial court revoked the Defendant's bond.

Having found no further tampering, the trial continued. The jury found the Defendant guilty of one count of theft over $10,000. He was sentenced on April 7, 2007, to ten years in the Department of Correction. He now appeals.

## Analysis

### I. Denial of Continuance

Upon learning of the existence and contents of Susan Blanchard's statement, and after the trial court revoked his bond, the Defendant requested a continuance in order to prepare a defense against Blanchard's potential testimony. The trial court denied his motion. It is well established that "a trial judge will not be put in error for denying a continuance unless it is shown that he has abused his discretion in doing so . . . ." Moorehead v. State, 409 S.W.2d 357, 358 (Tenn. 1966). "An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted." State v. Hines, 919 S.W.2d 573, 579 (Tenn. 1995).

Blanchard did not testify at trial, nor was her statement introduced into evidence. We cannot conclude that a different result would have followed at trial had the Defendant been given time to prepare to rebut evidence that the State did not present. Defense counsel, in fact, noted in response to the court's denial of his pre-trial continuance motion that "I guess that's kind of what I was trying to say . . . if [Blanchard] was allowed [to testify], then that's when I would make the motion for a continuance." She was not called as a witness. This issue is therefore without merit.

### II. Denial of Motion for Mistrial

Before Jimmy Calloway testified in rebuttal for the State, the trial court held a jury-out conference to determine the admissibility of Calloway's prospective testimony. Reviewing Calloway's previous statement, the court determined that Calloway planned to testify that the Defendant had told him that "'if he,' meaning the [D]efendant, 'had to do six years somebody was going to pay . . . .'" The State noted that "some of the testimony may need to be tapered because it mentions the jail sentence and I know we're not supposed to bring that up in front of the jury."

In making its ruling, the trial court first found the testimony relevant because it tended to show that the Defendant "had a motive to attempt to influence this witness to testify falsely." See Tenn. R. Evid. 401. The court then considered whether the proof's probative value outweighed the risk of unfair prejudice to the Defendant, see Tennessee Rule of Evidence 403, and found that it did:

"[T]he statement doesn't say anything about a specific range of punishment that he knew he was going to receive because of being convicted for prior offenses. Just because [six years] happens to be the low end of this range is nothing that the jury has been or will be instructed with regard to. And the jury will be instructed that punishment is a matter for the [c]ourt."

Having determined the admissibility of Calloway's testimony regarding the Defendant's fear of going to jail for six years, the court brought the jury back in. The relevant portion of Calloway's testimony proceeded as follows:

> [State]: Do you remember [the Defendant] talking to you on one occasion that he had some beer with him?
> [Calloway]: Yeah, he had some beer that he had carried up over there, and I was standing on my porch and he was standing there telling me that if he had to go back to prison for six more years that somebody would –
> [Defense Counsel]: I object to that, your Honor.
> [Court]: Sustained. The jury will disregard the witness's last statement.
> [State]: Without going into prison or those type of issues, what else did he say to you?
> [Calloway]: He just told me that if he – that somebody would pay, is more or less – it was a – I kind of took it as a threat or it was directed toward me as a threat, but I wasn't threatened by him.

Following the State's direct examination, the court instructed the jury that "the witness's comments about the [D]efendant didn't want to go back to the penitentiary, there is absolutely no evidence at all in the record that would support a comment or a statement from this witness like that. It's not in your record. You should strike it from your memory as if it was never stated. There's absolutely no evidence that this [D]efendant has been in the penitentiary before at all." Defense counsel then conducted his cross-examination and moved for a mistrial thereafter, which the court denied.

The Defendant now contends that by sustaining his objection during Calloway's direct examination the trial court "realized – albeit belatedly – the error of its previous ruling that the statement would be allowed into evidence." In our view, this does not accurately reflect what occurred at trial. The court's ruling in the jury-out conference before Calloway's testimony found admissible the Defendant's statement that he did not want to go to jail for a particular period of time, six years. The court then found inadmissible, during Calloway's direct examination, not the Defendant's fear of six years of incarceration, but his statement that he did not want to "go back to prison." (Emphasis added). This intimation that the Defendant had been incarcerated before presented a different issue than the one the trial court had ruled on previously.

We will thus examine the court's rulings on both issues and determine whether the Defendant was entitled to a mistrial. In a criminal trial, a mistrial should only be declared "in the event of a 'manifest necessity' that requires such action." State v. Reid, 164 S.W.3d 286, 341 (Tenn. 2005) (quoting State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998)). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388. An abstract formula should not be applied mechanically in determining whether a mistrial was necessary, and all relevant circumstances should be taken into account. State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993). Whether a

mistrial should be granted is a determination left to the sound discretion of the trial court. Reid, 164 S.W.3d at 342 (citing State v. Smith, 871 S.W.2d 667, 672 (Tenn. 1994)). The trial court's decision should not be overturned absent an abuse of discretion. Id. Additionally, the party arguing that a mistrial should have been granted bears the burden of establishing its necessity. Id. (citing Williams, 929 S.W.2d at 388).

In State v. Lawrence Taylor, No. W2002-00183-CCA-R3-CD, 2003 WL 402276, at *4 (Tenn. Crim. App., Jackson, Feb. 14, 2003), this Court emphasized three non-exclusive factors that may be evaluated in determining whether a mistrial was necessary because inappropriate testimony was presented to the jury: "(1) whether the [S]tate elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the State's proof." Id. (citing State v. Demetrius Holmes, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *4 (Tenn. Crim. App., Knoxville, Nov. 30, 2001)).

The trial court's admission of Calloway's testimony that the Defendant was afraid of going to jail for six years did not warrant a mistrial because it did not result in the presentation of inappropriate testimony. See id. The determination of whether evidence is logically relevant is governed by Tennessee Rule of Evidence 401. Trial courts have broad discretion in assessing relevance, and we will not overturn their decisions absent an abuse of discretion below. State v. Stinnet, 958 S.W.2d 329, 331 (Tenn. 1997); State v. Dubose, 953 S.W.2d 649, 653 (Tenn. 1997). The trial court's exercise of discretion may not be reversed unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Only relevant evidence is admissible. See Tenn. R. Evid. 402. Calloway's testimony that the Defendant feared going to prison for six years can be seen as enhancing his desire to avoid incarceration, and therefore, increasing the believability of the personal threat Calloway perceived. We conclude that the trial court did not abuse its discretion in finding this testimony relevant, as it tends to rebut the credibility of the Defendant's alibi witnesses.

The Defendant also contends that the evidence, if found relevant, should have been excluded because a danger of unfair prejudice substantially outweighed its probative value. See Tenn. R. Evid. 403. He defines unfair prejudice as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). In arguing for such a tendency, however, he only addresses Calloway's overruled testimony that the Defendant did not want to "go back" to prison. This is not the statement the trial court found admissible under Tennessee Rule of Evidence 403; again, that statement was not admitted at all. Because the Defendant neglects to argue that his "six years" statement was admitted in violation of Rule 403, and because we do not see how the Defendant's belief that he might be incarcerated for six years, as opposed to any other period of time, could have prejudiced him, we conclude that the trial court did not abuse its discretion in admitting this testimony. This statement therefore did not warrant a mistrial.

-7-

We next determine whether the trial court erred in failing to grant a mistrial after Calloway testified that the Defendant did not wish to "go back" to prison. This inappropriate testimony was heard by the the jury. As such, we turn to the three factors noted above. See Taylor, 2003 WL 402276, at *4. First, the State did not directly elicit Calloway's testimony. The improper statement was not in direct response to a question. Second, the trial court followed the Defendant's sustained objection with a curative instruction. Although the State's proof was not overwhelming, we conclude that the trial court did not abuse its discretion in failing to grant the Defendant a mistrial.

## III. Deprivation of the Right to a Fair Trial

"The right to a fair trial before an impartial tribunal is a fundamental constitutional right." State v. Austin, 87 S.W.3d 447, 470 (Tenn. 2003). The Defendant next contends that his trial was not presided over by an impartial judge and that he was thus deprived of a fair trial. As evidence for this claim he presents two statements. The first was made before the Defendant's bond hearing. The trial court, referring to Susan Blanchard's statement alleging jury tampering, stated that "it's come to the [c]ourt's attention that there are allegations and there is proof that's been presented to the [c]ourt – but we're going to actually conduct a hearing at this time for the purposes of revoking [the Defendant's] bond." In the second statement, made immediately after it had, in fact, revoked the Defendant's bond, the trial court considered whether to shackle the Defendant,[1] and stated that "[the Defendant] has attempted to influence at least one juror. We suspect there's more than that. As a matter of fact, we have proof of some sort of more than that, sir. So, I don't know what [the Defendant] is capable of doing."

The State correctly notes that the Defendant has waived this issue by failing to raise it in his motion for a new trial. See Tenn. R. App. P. 3(e). We must therefore treat this issue as waived unless it is deemed to be plain error. Tenn. R. App. P. 52(b). Plain error requires that five factors be established: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

The Defendant implies that the trial judge should have recused himself. Recusal is warranted "when a person of ordinary prudence, in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994).

We conclude that the trial court did not breach this rule of law; consequently, the Defendant has not established plain error. The Defendant concedes that both of the trial court's statements were made outside the presence of the jury. In arguing that the statements provide a basis for questioning the trial judge's impartiality, he states that "it is clear that the trial court had made his mind up on the culpability of the [D]efendant." We disagree. While the trial court's first statement may have

---

[1] The court ultimately chose not to shackle the Defendant.

been conclusory, it related only to the Defendant's alleged jury tampering, not his guilt or innocence of theft. The trial court then proceeded to conduct a bond hearing in an impartial manner, allowing both the State and the Defendant the opportunity to examine witnesses and introduce evidence. The trial court's second statement also does not indicate any impartiality with respect to the theft charge; the trial court, having just been presented with evidence that the Defendant was capable of jury tampering, was concerned that he might be capable of flight or violence. This issue is without merit.

## IV. Sufficiency of the Evidence

The Defendant next contends that the State presented insufficient evidence of his identity as the driver of Fox's dump truck. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in the light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

The Defendant was convicted of one count of theft over $10,000. Tennessee Code Annotated section 39-14-103 establishes that "a person commits theft of property if, with intent to deprive the owner of the property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Theft is a Class C felony "if the value of the property or services obtained is ten thousand dollars or more but less than sixty thousand dollars." Tenn. Code Ann. § 39-14-105(4).

The Defendant notes that the State offered only one witness, Lisa Calfee, to testify that he drove Fox's truck. He also notes a number of reasons why he believes Calfee's testimony lacked credibility, arguing that she could not have retained a clear picture of the driver's face, obscured as

it may have been by the brim of a "Gilligan-type" hat, after viewing it for only one or two seconds and from ten to fifteen feet away. He also generally questions Calfee's credibility based on the physical description she gave to Det. Ivy, which, although she had only seen the driver's head, included an estimate of his height and weight. The Defendant's two alibi witnesses, further, place him either in front of his grandfather's property, or working on his steps, at all times during which the theft could have been committed. Finally, we note Cody's testimony that Calfee, when walking out of the Rocky Top General Store, yelled at the dump truck's driver when she was about thirty feet away, and perhaps before she could have seen his face.

Although not overwhelming, we conclude that the State's evidence is sufficient to establish the Defendant's identity beyond a reasonable doubt. Fox testified that he owned the stolen dump truck and trailer and did not give anyone consent to take them. The Defendant did not contest Fox's testimony that the truck and trailer were worth about $30,000 on July 22, 2004. As to the issue of identity, Calfee testified that she was 100% sure she saw the Defendant driving the truck, and she easily identified him nearly seven months after the theft. The jury evidently did not find the Defendant's alibi witnesses credible, a judgment we must respect. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. A rational jury could have found that the Defendant intended to deprive Fox of the truck, given that he drove it a number of miles away, into another county, abandoning it only after being spotted. This issue is without merit.

## V. Waiver of Right to Testify

The Defendant next contends that the trial court erred by failing to confirm that he had personally waived his right to testify. See Momon v. State, 18 S.W.3d 152, 162 (Tenn. 1999). The State correctly notes that the Defendant failed to raise this issue in his motion for a new trial; we are therefore limited to plain error review. See Tenn. R. App. P. 3(e), 52(b). Again, a Defendant must establish five factors in order to demonstrate plain error: (1) "the record must clearly establish what happened in the trial court"; (2) "a clear and unequivocal rule of law must have been breached"; (3) "a substantial right of the accused must have been adversely affected"; (4) "the accused did not waive the issue for tactical reasons"; and (5) "consideration of the error is necessary to do substantial justice." Adkisson, 899 S.W.2d at 641-42.

The State concedes that no hearing was held before the close of proof at trial, pursuant to the mandate of Momon to determine whether the Defendant personally waived his right to testify. See 18 S.W.3d at 162. In Momon the Tennessee Supreme Court held that the right of a defendant to testify in his own behalf is a fundamental constitutional right that may only be waived personally by a defendant. Id. at 161. The Defendant can thus satisfy the second and third factors for plain error review. The completeness of the record before us establishes the first factor; that record contains no suggestion that the Defendant waived the issue for tactical reasons, establishing the fourth factor. We must therefore determine whether consideration of the trial court's failure to confirm the Defendant's personal waiver of his right to testify is necessary to do substantial justice.

In doing so, we first note that the Momon court held that "the mere failure to follow [the procedure set forth in Momon] will not in and of itself support a claim for deprivation of the

constitutional right to testify if there is evidence in the record to establish that the right was otherwise personally waived by the defendant." Id. at 163. At no point during trial did the court in this case confirm that the Defendant had personally waived his right to testify. The court had the following conversation with the sworn Defendant, his counsel, and the State at the beginning of the Defendant's sentencing hearing, however:

[Court]: Mr. Knight, are you under the influence of any intoxicants right now?
[Defendant]: No.
[Court]: Do you remember the day of your trial?
[Defendant]: Yes.
[Court]: You elected not to testify in your case; do you remember that?
[Defendant]: Yes, sir.
[Court]: Did you and your lawyer discuss whether or not you were going to testify?
[Defendant]: Yes, sir.
[Court]: What were your desires with regard to testifying or not testifying?
[Defendant]: I just decided against it.
[Court]: You do know that you had a right to testify in that trial; don't you?
[Defendant]: Yes, sir.
[Court]: Whose decision was it to testify or not?
[Defendant]: Mine.
[Court]: Did your lawyer advise you one way or the other?
[Defendant]: He just said, "It would be best if you didn't."
[Court]: [Defense counsel] said it would be best if you didn't?
[Defendant]: (Nods).
[Court]: Pardon?
[Defendant]: Yes.
[Court]: And if I were to remind you that you did have a right to testify in your defense, would that have changed your decision in any way?
[Defendant]: It probably would.
[Court]: It probably would?
[Defendant]: Yes.
[Court]: Why is that? If I had just said, Mr. Knight, you did know that you have the right to testify like that, that alone would have changed –
[Defendant]: Just the thing that happened the day of that trial.
[Court]: No, I am talking about before the trial.
[Defendant]: Oh.
[Court]: I am saying, if I would have reminded you while you were putting on your defense, if I would have said, Mr. Knight, you have the right to testify, would that have changed your mind?
[Defendant]: I guess. I don't know, probably not.
[Court]: Do you remember why it was that you elected not to testify? You don't have to tell me, I'm just asking.
[Defendant]: No.

[Court]: As a matter of fact, I don't want you to tell me.
[Defendant]: I don't remember.
[Court]: [Defense counsel], is there anything you want to ask him about his election not to testify?
[Defense Counsel]: If I may, I can state for the record, Your [sic] Honor, it was discussed in detail even before the trial and after the State put on its proof. As always in that type of situation – I understood the significance of it, we – of course, this trial has been continued several times. We had prepared for this trial at least two other occasions pretty much full and discussed it both times, too. Of course, I explained to him it was his decision, basically; and, of course, I as always gave him my advice of what I felt he should do. Of course, I, if I have a client that insists upon testifying, of course, I make sure that that is brought before the Court's attention.

There was no problem between me and [the Defendant] at the time when we started in on our discussions. Of course, I can't go into what was discussed, but it was discussed in detail, and I can understand the problem on that date. [The Defendant] may not remember some specifics of things at this time, but I can state that we had them.
[Court]: The Court is mindful that the State gave notice of its intention of to use as impeaching evidence [the Defendant's] prior felony convictions; is that right?
[State]: Yes, sir. We had given him notice of that and – that was the main issue.

The Momon court outlined four non-exclusive factors a reviewing court should consider "when determining whether denial of the right to testify is harmless beyond a reasonable doubt." Id. at 168. We need not reach these factors, however, because we conclude that the record demonstrates that the Defendant, rather than being denied his right to testify, personally waived his right to do so. The Defendant's decision would have been the same had the court discussed, at trial, his right to testify in his own defense. We therefore conclude that the trial court's error in failing to follow the dictates of Momon was harmless, and thus, that consideration of the court's error is unnecessary to do substantial justice. The Defendant is not entitled to relief on this issue.

## VI. Enhancement of Sentence

The Defendant does not contest his status as a Range II, multiple offender for sentencing purposes. He does contend, however, that the trial court impermissibly sentenced him to the maximum sentence, ten years, for his theft. See Tenn. Code Ann. § 40-35-112(b)(3).

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make on the defendant's own

-12-

behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b);[2] State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

Although he fails to mention in his brief any mitigating factors that he believes should have applied, the Defendant did argue at sentencing that his theft of the dump truck neither caused nor threatened serious bodily injury. See Tenn. Code Ann. § 40-35-113(1). After hearing this argument, and after discussing the Defendant's prior convictions and criminal conduct, the court said that "[p]rimarily due to his extensive criminal history, in addition to that necessary to establish his range, the [c]ourt does enhance [the Defendant's] sentence to ten years. Now, considering the mitigating factors." Immediately thereafter the trial court engaged in a bench conference requested by the Defendant. The court then continued: "Now, the [c]ourt will consider mitigating factors. The [c]ourt finds they apply." The court then proceeded to sentence the Defendant to ten years in the Department of Correction as a Range II, multiple offender.

On this basis, the Defendant essentially argues that the record contains no affirmative showing that the trial court considered any mitigating factors when sentencing him. We disagree. Although the trial court's consideration was certainly not exhaustive, it did state that it had found

---

[2]We note that the legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, said changes becoming effective June 7, 2005. However, the Defendant's crime in this case occurred prior to June 7, 2005, and the Defendant did not elect to be sentenced under the provisions of the Act by executing a waiver of his ex post facto protections. See 2005 Tenn. Pub. Acts ch. 353, § 18. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crime was committed.

applicable the Defendant's suggested mitigating factors. In sentencing the Defendant to the maximum of ten years, the trial court evidently decided that those mitigating factors had little weight, a decision within its discretion. See State v. Marshall, 870 S.W.2d 532, 541 (Tenn. Crim. App. 1993). We therefore conclude that trial court considered the sentencing principles and all relevant facts and circumstances. See Ashby, 823 S.W.2d at 169. Accordingly, the Defendant is required to overcome the presumption of correctness we must afford the trial court. Id.

The presentence report reflects that the Defendant was thirty-five years old at the time of sentencing, was unmarried, and had no children. He was a high school graduate, and had some history of employment with his father's surveying business. The Defendant's history of criminal convictions and criminal behavior was set forth in the presentence report and at the sentencing hearing. His criminal history includes a 2001 guilty plea in the United States District Court for the Eastern District of Tennessee to one count of conspiracy to distribute cocaine and marijuana, one count of conspiracy to commit offenses against the United States, and one count of operating a "chop shop." The record reflects that the "chop shop" conviction involved approximately twenty vehicles being stolen and dismantled over a time period of approximately two years. The total value of the stolen vehicles was between $500,000 and $800,000. The Defendant does not contest that this evidence is sufficient to support the trial court's use as an enhancement factor its finding that he "has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish [his Range II, multiple offender status]." See Tenn. Code Ann. § 40-35-114(1).

The Defendant argues that the trial court acted improperly in enhancing his sentence before considering any mitigating factors. The version of the Sentencing Reform Act under which the Defendant was sentenced outlines exactly this process, however, stating that "[s]hould there be enhancement and mitigating factors for a Class B, C, D, or E felony, the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, then reduce the sentence within the range as appropriate for the mitigating factors." Tenn. Code Ann. 40-35-210(e). Accordingly, we affirm the Defendant's sentence.

## Conclusion

Based on the foregoing authorities and reasoning, we affirm the Defendant's conviction and sentence.

_____
DAVID H. WELLES, JUDGE

-14-